Ben C. Gerwick, Inc. v. Commissioner.
Ben C. Gerwick, Inc. v. Commissioner
Docket Nos. 38089, 39045.
United States Tax Court
1954 Tax Ct. Memo LEXIS 255; 13 T.C.M. (CCH) 314; T.C.M. (RIA) 54100; March 31, 1954
Gordon Johnson, Esq., A. Barlow Ferguson, Esq., and Robert L. Bridges, Esq., for the petitioner. T. M. Mather, Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: The Commissioner has determined deficiencies for the years 1945 and 1946, as follows: Docket
No.
Year
Tax
Deficiency
38089
1945
Income
$ 15,959.12
Declared Value Ex-
cess Profits
1,172.48
Excess Profits
546,811.90
39045
1946
Income
84,749.54
The question to be decided is whether income from a contract with the Navy for the construction of three submarine and destroyer drydocks at Hunters Point, California, which is attributable to work completed and paid for before the end of 1945, is includible in petitioner's income for 1945. The deficiency for 1946 results *256 from including the income from the same contract in petitioner's income for 1946 solely to protect the Government's interests against the running of the statute of limitations. The parties are agreed that the decision of the question relating to 1945 will enable the parties to dispose of petitioner's income tax liability for 1946 under Rule 50. The petitioner filed its returns for 1945 and 1946 with the collector for the first district of California. Findings of Fact The facts which have been stipulated are found as facts. The stipulations of facts and the attached exhibits are incorporated herein by this reference. Petitioner is a California corporation, incorporated on January 25, 1926, with its principal office in San Francisco. Since its incorporation, it has been engaged in the construction contracting business, specializing in the construction of piers, wharves, docks, terminals, and foundations for industrial facilities. Petitioner has at all times regularly and consistently kept its books and reported its income from long-term contracts on the basis provided by Regulations 111, section 29.42-4(b), and the same subsection of prior regulations. On May 13, 1943, petitioner *257 filed a bid with the Navy Department, Bureau of Yards and Docks, for the construction of three drydocks at the Naval Drydocks at Hunters Point, San Francisco, on a lump sum contract basis. Petitioner's bid was accepted by the Navy, and on June 11, 1943, the United States Government entered into a lump sum contract with petitioner in the amount of $3,684.000. The contract was designated Contract NOy-6183. Under the original contract, petitioner agreed to furnish all necessary material and equipment, and perform all work for providing and securing the construction of three submarine and destroyer drydocks, known as Drydocks Nos. 5, 6, and 7, and auxiliary facilities. The parties to the original contract understood that the entire project was not covered by plans and specifications completed at the time the contract was signed but that as soon as additional and necessary plans and specifications for the entire contract project were prepared and approved they would be incorporated into and made part of the contract under the "Change Order" procedure. When the contract was signed, only the plans and specifications for foundations and basic drydock structures had been prepared. As the *258 work progressed, the Navy Department issued the so-called "change orders" which called for the progressive construction of the basic project and for the necessary auxiliary facilities such as steam, electric, and air power, closure gates, access to the docks from the shore, and so forth. Forty-three change orders were entered into which amended the original contract and increased the total consideration under the contract to $6,710,290.08. All of the work under the original contract and most of the change orders was completed before the end of 1945. Work which was not completed was work under Change Order "T", and the work under that order was 92 per cent complete by the end of 1945. The work designated as Change Order "T" was usably complete at the end of 1945 but delay in the completion was occasioned by the unavailability of valves, fittings, and materials, which was beyond petitioner's control. By October 22, 1945, all of the work under the contract had been completed, and 90 per cent of the work under Change Order "T" had been completed. The work under Change Order "T" was completed February 21, 1946. In the contract and change orders, the price to be paid for each part of *259 the progressive work was stated separately. Prior to October 22, 1945, payments received by petitioner amounted to $6,510,535.08. By the end of 1945, petitioner had been paid $6,661,490.08 which was the total consideration for the original contract and all change orders except $48,800 representing the balance of the contract price under Change Order "T" in the amount of $30,000, and retained percentages of $18,000. The sum of $48,800 was paid to petitioner on September 5, 1946 under a final voucher dated August 5, 1946. On August 7, 1946, the entire contract work was accepted by the Officer in Charge of Construction. Under date of August 14, 1945, the Officer in Charge of Construction for the Navy, pursuant to petitioner's request, in its letter of July 30, 1945, accepted the work which had been completed, up to August 14, 1945, relieving petitioner from responsibility and releasing the retained percentage of the moneys previously withheld on such completed work. Petitioner, in its letter of July 30, 1945, requesting the acceptance of completed work, stated as follows: "The following resume of the subject contract as amended from time to time is presented herewith with the *260 end in view of immediate final formal acceptance by the Navy Department of all work accomplished to date and also release of Ben C. Gerwick, Inc., of all responsibility for these various constructions now in use by the Federal Government. "RESUME OF CONTRACT NOy 6183 - SUBMARINE AND DESTROYER DRYDOCKS - HUNTERS POINT Original Contract
$3,684,000.00
Change 'A' -
Additional Dredging
7,632.00
Change 'B' -
Dykes and Grading
6,600.00
Change 'C' -
Extend Plug
13,500.00
Change 'D' -
Redesigned Motor
Generators
2,350.00
Change 'E' -
Terrado Control
3,250.00
Change 'F' -
Reinforcing Steel
13,200.00
Change 'G' -
Maint. Dredging
40,500.00
Change 'H' -
Acceleration of Con-
tract
150,000.00
Change 'I' -
Repair Fender Sys-
tem
11,300.00
Change 'J' -
Dredge Harbor Pier
33
13,200.00
Change 'K' -
Galvanizing
4,800.00
Change 'L' -
Ladder Rungs
158.00
Change 'M' -
Pin Markers
1,260.00
Change 'N' -
Increase Size of Elec.
Man Holes
500.00
Change 'O' -
Reinforcing Steel By
Gov't
14,480.12
Change 'P' -
Closure Gates
287,200.00
Change 'Q' -
Pressure Cells
6,555.00
Change 'R' -
Temp. Elec. Con-
nection
830.00
Change 'S' -
Reinforcing Steel
4,350.00
* Change 'T' -
Steam Power Plant
376,000.00
Change 'U' -
Reinforcing Steel
12,900.00
Change 'V' -
Mechanical Revisions
55,900.00
Change 'W' -
Torredo Control
2,000.00
Change 'X' -
Buy and Equip Barge
8,500.00
Change 'Y' -
Temporary Sewer
Connection
460.00
Change 'Z' -
Electrical Work
117,600.00
Change 'A-2' -
Temporary Track
4,000.00
Change 'B-2' -
Replace Gate Fenders
215.00
Change 'C-2' -
Handrail on Altars
4,400.00
Change 'D-2' -
'A' Changes
49,800.00
Change 'E-2' -
Increase in Time
Only
Change 'F-2' -
Crane Rental
12,079.80
Change 'G-2' -
Miscellaneous
700.00
Change 'H-2' -
Trackage, Drainage
& Paving
383,000.00
Change 'I-2' -
Four Misc. Items
2,610.00
Change 'J-2' -
Rent Bridge
4,500.00
Change 'K-2' -
Elec.-Mech. Services
South of D. D.'s
707,000.00
Change 'L-2' -
Purchase Steel Piling
716,400.00
Change 'M-2' -
Erect Two Portal
Cranes
35,825.00
*** Piling Resume - Creo-
sote & Green
36,100.00
*** Gov't. Furnished Ma-
terial
20,400.00
** Furnish Closure Gate
Connections
400.00
Total Approximated
Contract Price
$6,708,835.08
*261 "The work of the original contract in the amount of $3,684,000.00, merely for the drydock structures devoid of the utilities and services necessary for operation, was completed well within the contract time for completion as twice amended by formal changes. Also completed within this same time was considerable of the additional work now part of the many times amended contract, additional work such as utilities, services, closure gates and approaches, without which the use of the drydocks was impossible. In effect there was turned over to the Government for successful operation a complete and workable drydocking plant comprised of all necessary functions, the construction of many of which was far outside the original scope of the contract and all completed well within the specified contract time for completion of the original contract. "All work now a part of Contract NOy 6183 and not completed as above noted in conjunction with the drydocks proper has been, in nature, installations of various equipment auxiliary *262 to existing yard facilities and bearing no direct relation to the operation of Drydocks 5, 6, and 7. Procurement of material for projects far removed from these drydocks has also been incorporated in the contract. Completion of these later services and facilities has been retarded due to design complications resulting in late starting dates and lack of receipt of equipment and materials due to the operation of the priority system. "More than a year has now elapsed since the first two drydocks, Nos. 5 and 6, were put in operation by the Navy Department while practically a whole year has passed since the third and last dock, No. 7, was made available to the Government. "Of all work included in the amended contract there remains to be completed only the delivery and installation of a small electric auxiliary generator valued at $700.00 to be used as an emergency unit for lighting in the Salt Water Pumping Plant, a part of Change 'K-2' (shipment of this equipment has now been set back five times); about twenty percent of the mechanical installations of the power plant or about ten percent of the whole 'Extension to the Central Steam Power Plant' valued at approximately $40,000.00; *263 and the installation of an experimental alternative method of control of the Closure Gates to the drydocks proper for which no total price has been agreed. These uncompleted portions of the various installations have no effect on the operation or utility of any part of the various projects, with the exception of the addition to the Power Plant which may be placed in operation for steam output, using some of the existing auxiliary equipment by August 20, 1945. Final completion of these relatively small items amounting to about three-tenths of one percent of the total contract is dependent entirely upon delivery to us of various pieces of equipment, adverse receipt of which is the direct result of the operation of the priority system as necessarily set up by agencies of the Federal Government and as a consequence entirely beyond our control. "We respectfully and formally make the following requests, all of which are just and equitable, and as such are entirely in order under the extenuating circumstances surrounding the subject contract: - 1. That the United States Government acting through the Navy Department make formal acceptance from Ben C. Gerwick, Inc., of all work completed *264 to date. 2. That Ben C. Gerwick, Inc., be absolved of all responsibility for the maintenance, protection and operation of all accepted work now in possession of and being used by the Navy Department. 3. That all monies now being retained by the Government for their protection, except a fair percentage of the work yet remaining to be completed, amounting to approximately $5,000.00 be released to Ben C. Gerwick, Inc. It is to be noted that ample coverage for the protection of the government is provided by the contractor in the form of the specified performance and payment bonds. 4. That the issuance of the four remaining formal changes to the contract, namely the piling resume; government furnished material; power plant extension and closure gate control, be expedited as much as possible. 5. That the installation of the experimental alternative method of closure gate operation be made by Navy Department forces, the three necessary Chicsan Swival Joints now on order by our subcontractor, Cory and Joslin, Inc., to be turned over to the Navy Department upon their receipt from the manufacturer, and that the scope of the formal change for this work be limited to the supplying to *265 the government of these joints in a total amount of $400.00. 6. That final consideration of total contract time for completion beyond that considered necessary by the Board Report on Change 'T' for the Extension to the Central Steam Power Plant be held in abeyance until such time as all equipment now lacking shall have been actually delivered to the site of construction. "The requests made herewith are based upon the assumption that no additional work will be assigned to the subject contract; however, should it be deemed advisable by the Navy Department to further extend the scope of Contract NOy 6183, other arrangements looking toward the final settlement of the contract may be more in order." In his letter of August 14, 1945, replying to petitioner's letter of July 30, 1945, the Officer in Charge of Construction advised petitioner as follows: "Subj.: Contract NOy-6183, Specification No. 11147, Submarine and Destroyer Docks, U.S. Naval Dry Docks, Hunters Point, California - COMPLETION AND ACCEPTANCE Ref.: (a) BCG 1tr to CinCC, HP, dtd 30 July 1945 "Gentlemen: "The report on the present financial and physical status of subject contract submitted by the referenced letter *266 and your requests therein relative to acceptance by the Navy and release of retained percentage on all work completed to date has been reviewed by the Officer in Charge of Construction. The Officer in Charge of Construction concurs that all work under the original contract and the below listed authorized Change Orders have been completed in accordance with plans and specifications. The Navy, therefore, accepts and relieves the contractor of all responsibility for maintenance, protection and operation of these facilities and releases the retained percentage on monies previously withheld on the following completed work: Original Contract
Change 'A'
Change 'M'
Change 'A-2'
Change 'B'
Change 'N'
Change 'B-2'
Change 'C'
Change 'O'
Change 'C-2'
Change 'D'
Change 'P'
Change 'D-2'
Change 'E'
Change 'Q'
Change 'E-2'
Change 'F'
Change 'R'
Change 'F-2'
Change 'G'
Change 'S'
Change 'G-2'
Change 'H'
Change 'U'
Change 'H-2'
Change 'I'
Change 'V'
Change 'I-2'
Change 'J'
Change 'W'
Change 'J-2'
Change 'K'
Change 'X'
Change 'L-2'
Change 'L'
Change 'Y'
Change 'M-2'
Change 'Z' All work under Change K-2 has been completed in accordance with *267 plans and specifications with the exception of furnishing and installing an auxiliary generator in the salt water pumping plant. The Officer in Charge of Construction agrees that delivery of this item is beyond the contractors control and, therefore, accepts for the Navy all work completed under this Change Order and relieves the contractor of all responsibility for maintenance, protection and operation. The retained percentage is released but to safeguard the interests of the Navy, $1,000 will be withheld pending installation of the above mentioned generator. The extension to the central steam power plant will not be accepted until all work is completed and in order to safeguard the interests of the Government, 5% of the estimated cost of this change will be withheld until final acceptance of the work." The $1,000 retained with respect to Change K-2 was released before the end of 1945. Another change, "P 2", which was not referred to in the Navy's letter of August 14, 1945, was issued by the Navy on October 19, 1945. The work under "P 2" was paid for by the Navy, in the amount of $38,100, before the end of 1945, and the work was completed before the end of 1945. The following *268 provision is contained in Contract NOy-6183: "Article 16(b). - In making such partial payments the full amount of said approved estimates shall be paid, except that, on specific direction of the Contracting Officer, the Government may retain up to 10% thereof until final completion and acceptance of all work covered by this contract or earlier date as the Contracting Officer may approve for payment. Upon completion and acceptance of any separate item of work for which the price is separately stated in this contract, payment may be made in full therefor upon approval of such payment by the Contracting Officer, including retained percentages, less authorized deductions." The entire gross income derived by petitioner from Contract NOy-6183 was accounted for in petitioner's books and was reported by petitioner in its return for 1946. The Commissioner determined in Docket No. 38089, that the petitioner realized income in the total amount of $766,041.72 from the total contract payments it received amounting to $6,710,290.08. He determined that of the total income derived, $766,041.72, the sum of $718,623.74 represented income for 1945, and $47,417.98 represented income for 1946. Accordingly, *269 he increased petitioner's income for 1945 by $718,623.74. In making the above determination with respect to the amount of income realized in 1945, the Commissioner determined that petitioner received $6,295,190.08 of the total contract payments in 1945, and $415,100 of the total contract payments in 1946. The latter amount, $415,100, represents $376,000 applicable to Change Order "T", $38,100 applicable to Change Order "P 2", and $1,000 retained from Change Order "K". The Commissioner has determined that income in the amount of $718,623.74 was attributable to contract payments amounting to $6,295,190.08; and that income in the amount of $47,417.98 was attributable to contract payments amounting to $415,100. Contract NOy-6183 was "finally completed" by petitioner and "accepted" by the Navy in 1945. Opinion The question to be decided relates to the year 1945. The year 1946, Docket No. 39045, is involved only because the Commissioner made a determination for that year to protect his interests. The parties are agreed that decision of the question for 1945 will enable the parties to settle petitioner's income tax liability for 1946 under Rule 50. The petitioner's practice and *270 method of reporting income from long-term contracts is not questioned in these proceedings. The Commissioner simply takes the position that under that method of reporting income, it is proper for petitioner to include in its income for 1945, the income which is attributable to payments for work under Navy Contract NOy-6183 which respondent has determined was completed by petitioner, accepted by the Navy, and paid for before the end of 1945. The Commissioner contends that Contract NOy-6183 contained provisions which require accounting for and reporting income in the way he has determined; and he argues that petitioner cannot properly, under its method of reporting income from long-term contracts, defer the reporting of the income to a time (1946) which had no relationship to the completion of the contract. Petitioner relies upon the fact that the last work under the Navy contract was completed in 1946, and that on about August 7, 1946, the "final" acceptance of completion of the contract was given by the Navy. The question in this proceeding is, in the last analysis, in what year a contract with the Navy was completed. This is a question of fact to be determined from the contract *271 and all of the evidence relating to the conduct of the parties acting pursuant to the contract. Upon all of the evidence it is found that a contract with the Navy was completed by petitioner and accepted by the Navy in 1945. This finding is based upon the fact that the Navy on August 14, 1945 accepted the completed work, relieved petitioner from all responsibility, and released retained percentages of moneys previously withheld. Upon all of the evidence, it is concluded that respondent's determination with respect to the year 1945 is consistent with petitioner's method of reporting income on the long-term contract basis. The work under the original contract calling for payment of $3,684,000, for the construction of drydocks without utilities and auxiliary work was completed well within the time specified in the original contract. By July 5, 1945, more than a year had elapsed since the first two drydocks, numbers 5 and 6, had been put in operation by the Navy, and one year had elapsed since the third and last drydock was made available to the Navy. At the end of 1945, there remained to be done only the completion of work on a central steam power plant, under Change Order "T" which *272 was delayed by the delays occasioned by the operations of the existing priorities system as it applied to certain required materials. The delays were not caused by or due to petitioner. As a matter of fact, the central steam power plant was usably complete by September 1945. What remained to be done was minor and relatively small, involving 3/10 of 1 per cent of the total contract. The situation here is closely parallel to that in . Furthermore, it is clear, in our opinion, that under Article 16-b of the contract, petitioner's right to receive payment, including the retained percentages, accrued in 1945. Under , the year in which the income in question is taxable is not later than 1945. See, also, , affirming . This conclusion does not, in our opinion, deprive petitioner of the benefit of its consistent method of reporting income on the longterm contract basis. See ; *273 cf. (August 7, 1953). Petitioner's argument about the action of Westward Ho Yacht Club, a proceeding instituted against it and dismissed in January 1946 has been considered but we conclude that the point lacks merit in the light of all of the facts. Petitioner has cited , affirmed ; and . Those cases are, on their facts, distinguishable. It is held that within the meaning of section 29.42-4 of Regulations 111, Contract NOy-6183 was "finally completed" by petitioner and "accepted" by the Navy in 1945. The respondent's determination is sustained. Decision will be entered for the respondent in Docket No. 38089. Decision will be entered under Rule 50 in Docket No. 39045. Footnotes
*. Board Report Signed and Sent to Bureau Yards and Docks for Approval of Change ↩
***. Board Report about Complete↩
**. Approximate Only - Board Report Not Complete ↩